KATE WELLS (SBN 107051)
2600 Fresno Street
Santa Cruz, CA  95062
Telephone:      (831) 479-4475
Facsimile:      (831) 479-4470
Email:          lioness@got.net

AARON LODGE (SBN 220670)
1414 Soquel Avenue, Suite 222
Santa Cruz, California  95062
Telephone:      (831) 426-3030
Facsimile:      (831) 350-6234
Email:          ALodge@teachjustice.com

Attorneys for plaintiffs,
MONTEREY BAY CONFEDERATION OF CLUBS and
STEVE VERHAGEN

Filed
MAR 19 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION – ECF PROGRAM

| | |
|---|---|
| MONTEREY BAY CONFEDERATION OF CLUBS; STEVE VERHAGEN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SANTA CRUZ, a municipal corporation;  CITY OF SANTA CRUZ POLICE DEPARTMENT; TWENTY UNKNOWN CITY AND OTHER EMPLOYEES,<br><br>Defendants. | CASE # CV13- 1231 PSG<br><br>COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS UNDER THE FIRST, FIFTH, AND FOURTEENTH AMENDMENT.<br><br>DEMAND FOR JURY TRIAL |

### BRIEF SYNOPSIS OF THIS CASE

This action arises from an Easter Egg Basket Fundraiser event, principally attended by Bay Area motorcycle clubs and their individual members.  The event was advertised, and when local law enforcement agencies learned of the event, they banded together and targeted virtually all attending members on motorcycles, as they arrived to the Easter Egg Fundraiser event.  The motorcyclists were pulled over one by one, and the officers then inspected fully both the driver

Kate Wells
and
Aaron
Lodge,
Attorneys
for plaintiff

and passenger.

As is discussed in more detail below, the officers had no probable cause to make each of the stops, and in at least one case an officer fabricated evidence to justify arresting an individual. The event was thus greatly impacted, as most of the attending individuals were stopped and some cited, just before the event. Further, the officers maintained a very visible presence during the whole event, thus hampering and interfering with the event.

## JURISDICTION AND VENUE

1. This action arises under the Civil Rights Act of 1871 (42 U.S.C. Sections 1983 and 1988) and the Eighth Amendment to the Constitution of the United States. This Court has jurisdiction of the federal claims under 28 U.S.C. Section 1331, 1332, 1343(3) 1343(4), 2201, and 2202. This action further invokes other Constitutional rights and various other federal and state statutes, as described below under the causes of action.

2. Venue is proper in the Northern District of California, San Jose Division, pursuant to 28 U.S.C. § 1391, in that the subject matter of this action arose in this district, all defendants are subject to personal jurisdiction in this district, and there is no district in which the action may otherwise be brought.

## PARTIES

3. Plaintiff MONTERY BAY CONFEDERATION OF CLUBS (hereinafter referred to as "plaintiff") is a "resident" of Monterey, California, in Monterey County.

4. Plaintiff STEVE VERHAGEN is an individual, residing in Sacramento, California, Sacramento County.

5. Defendant CITY OF SANTA CRUZ (hereinafter "CITY") is a political subdivision of the State of California.

6. TWENTY UNKNOWN CITY AND OTHER EMPLOYEES (collectively hereinafter referred to as the "OFFICERS") were sheriff and/or police officers and/or correctional officers and/or other CITY personnel; in performing the acts alleged herein, these

Kate Wells and Aaron Lodge, Attorneys for plaintiff

defendants were acting as agents of the CITY and employed by the CITY and were acting individually, outside the course and scope of their employment; and, in performing all of the acts alleged herein, these defendants acted under color of state law and the statutes, ordinances, regulations, customs and usages of the CITY, and pursuant to the official policy, custom and practice of the CITY. These defendants are charged with enforcing state and local laws and additionally charged with knowledge and protection of citizens' constitutional rights while enforcing such laws.

7. The names and capacities of defendants TWENTY UNKNOWN CITY AND OTHER EMPLOYEES are presently unknown to the plaintiff. Each of these unknown parties has acted as agent of or in concert with the named defendants in the matters referred to herein and is responsible in some manner for the damages suffered by plaintiff. Plaintiff will amend this complaint to add the names and capacities of these defendants when ascertained.

8. In doing the things herein alleged, the defendants, and each of them, acted as the agent, servant, employee of the remaining defendants, and acted in concert with them

### FACTS GIVING RISE TO THE CLAIMS FOR RELIEF

9. The MONTEREY BAY CONFEDERATION OF CLUBS (MBCOC) is an entity that brings together multiple organizations and clubs relating to motorcycles. The confederation was formed because of some public beliefs about motorcycle riders which can be negative and prejudicial, and are normally not true. Members of the MBOCC are various local motorcycle clubs, whose constituents usually own a motorcycle, and who enjoy activities relating to them. Such activities include buying and selling motorcycles, repairing them, and of course riding them.

10. The MBCOC operates like many other organizations, planning events for its members, holding fund raising activities, and promoting their mission statement. Their mission statement is prominently displayed on their website and other public places where viewers may learn about the MBCOC. It says:

Kate Wells and Aaron Lodge, Attorneys for plaintiff

"The Mission of the Monterey Bay Confederation of Clubs is to Promote and Protect The Freedom Of All Motorcyclists and Motorcycle Clubs. The MBCOC has united to help abolish discrimination toward motorcyclists and increase communications within the motorcycle communities. We mean to accomplish this through education, legislation and judicial activities."

11. Many of the activities of the MBOCC and of its member clubs are family oriented and community based. Even club members with well-known names, such as the Hells Angels, actually are very family oriented, and have numerous events to support the community and to promote healthy and responsible riding. One such event, very important to this case, is the annual Easter Egg Basket Fundraising event, designed to raise both money and Easter egg baskets for underprivileged and homeless children in the community. The Hells Angels were thus responsible for the organization of this event, and notices went out to all members about this annual event.

12. For this year's event, members who wished to attend were asked to purchase tickets in advance, and were asked to bring an Easter egg basket to be donated to underprivileged and homeless youth. The event would include a Barbeque, a door prize give-away, and a few speeches regarding underprivileged youth and how the event would benefit them.

13. The event was scheduled for April 10, 2011. It was held at the Veterans of Foreign Wars (VFW) Hall, 2259 7th. Avenue, in Santa Cruz, California.

1. Before, and during the event, The Santa Cruz Gang Enforcement Task Force, under the apparent direction of Mario Sulay, set up an elaborate system to stop as many members as possible of the MBOCC. The operation involved officers from each a number of local law enforcement agencies, including the Santa Cruz Police Department, the Capitola Police Department, the Santa Cruz Sheriff Department, the Scotts Valley Police Department, the Watsonville Police Department, and the California Highway Patrol.

2. There were at least two units from each of those law enforcement agencies,

Kate Wells and Aaron Lodge, Attorneys for plaintiff

-4-
COMPLAINT FOR DAMAGES

which carefully inspected every approaching member of the MBOCC on his or her respective motorcycle. The officers checked every rider and every passenger for any possible safety violation. They further inspected for any possible weapons, drugs or any drivers under the influence. The officers hoped to "sanitize" their targeting of the club members by stating a reason for the stop, in each case. The majority of those stopped were told they had either a faulty brake light, a concealed blinker, or most commonly had simply failed to signal.

3. Once pulled over, the various officers would search, without permission in many cases, both the driver and passenger, and would also search the motorcycle itself. The officers then gathered as much information on the driver and passenger as possible, to fully profile all individuals attending the Easter Egg Basket Fundraising event. The officers thus checked their insurance, their driver's license, and ran a check on the individual.

4. The police ONLY pulled over motorcyclists. The police set themselves up at the nearest intersection to the VFW, so as to "catch" as many members of the MBOCC as possible. As the police pulled over the incoming motorcycle riders, and issued citations, the members realized they were being isolated and targeted, which put an immediate damper on what was supposed to be a fun day for members. The officers remained near the VFW and continued to pull over motorcyclists throughout the event, and especially those leaving the event.

5. Based upon belief, the police had no probable cause to set up this check point, and no legal reason to do so. The police operated on a prejudicial belief that motorcyclists are "bad," are "gang" members, or are always up to no good. The police continued to pull over motorcyclists approaching the VFW hall, one after the other, looking for any possible reason to write a ticket. In the great majority of stops, the police found nothing, and ultimately let the member go on to attend the Easter Egg Benefit.

6. In a few cases, the police found something and wrote tickets. In the case of plaintiff STEVE VERHAGEN, the police not only issued a citation but took him into custody! The facts regarding his arrest will be discussed fully, later in this complaint.

7. After it appeared to the police that all or most of the members had arrived at

the VFW hall, the police then decided to enter the hall itself! The police, along with the Gang Task Force, came into the VFW. As members saw the police and Gang Task Force entering, members began to quiet down, to see why the police were there. The police asked about what types of activities were scheduled for the day. The police seemed determined to find something wrong, something illegal, with the Easter Egg Fundraiser event.

8. As the police and other officers interrogated individuals at the event, looking for something that "might" be illegal, the officers honed in on the door prize give-away. The officers called it a "raffle." It was not a raffle, and in all the advance notices and advertising, there was never a raffle mentioned. Nevertheless, when the police and other officers heard that the proceeds were all going to underprivileged and homeless youth, the police announced that is illegal in the state of California, and is tantamount to a "raffle." The police then shut down the door prize give-away, and ordered the members to cease and desist from continuing any aspect of such a give-away, or from generating any money for the underprivileged and homeless youth organizations through giving away prizes.

9. Just before the police the entered the building of the event, one of the members was actually arrested and taken into custody, just before arriving. Steve Verhagen had been on his way to the event, with his girlfriend, Angela. They had already purchased their tickets and were coming from Sacramento, California. As they passed the VFW hall, on a motorcycle, they were immediately pulled over. The police officer asked if he was going to the event, and if so, why did he not have a blinker on? Mr. Verhagen answered that he was thinking of passing it by for the moment, and going to the nearby gas station first. The police responded 'in either case you should have had your right blinker on.' The police then pulled out the citation book to write Mr. Verhagen a ticket.

10. While the police were checking Mr. Verhagen's driver's license and insurance, they discovered he was currently on probation. The police became a bit excited to have "netted" someone of possible interest. Mr. Verhagen waited patiently with his girlfriend for the police to write them a ticket. He noticed there were seven police units all around him. Then, just a short time later, he noticed the full Gang Task Force arriving to assist in his ticket

for not using a right blinker.

11. The police and the Gang Task Force then asked Mr. Verhagen to remove his shirt, which he did. The police took pictures of his chest and arms. They asked him to loosen his pants and allow the police to view as much of his legs as possible. The police then took pictures of his legs. They further asked Angela also about any tattoos she might have, and asked to take pictures of those, if any.

12. After the initial search of Mr. Verhagen, the police had noticed the he had a lock for his bike. They also observed his wallet was attached to his pants by a small chain. One police officer surreptitiously attached the lock to the small chain, and then held it up, declaring that Mr. Verhagen had a weapon. Mr. Verhagen denied it was a weapon, and stated the lock is used to lock up his bike, and the chain was used for his wallet. Mr. Verhagen made it clear the lock was never attached to the chain at all, and the police conceived that idea, and put it together. The police denied they had done that, and insisted Mr. Verhagen had done it. The police then placed Mr. Verhagen under arrest for possession of an illegal weapon, and handcuffed him. They then prepared to transport him to jail.

13. The police had also searched Angela, and had removed her phone. She asked for her phone back, and the police said no. Angela pointed out she was not from this area, had no money, and really needed her phone to safely arrange a way to get back to her home in Sacramento. The police told her, "THAT IS WHAT YOU GET FOR HANGING OUT WITH DIRT BAGS!" The police then transported Mr. Verhagen to jail, and left Angela at the side of the road.

14. Mr. Verhagen was then taken to jail. He was criminally charged. The DA informed him they were going to try to obtain a sentence of 25 years to life. Mr. Verhagen's bail was set at 2 million dollars! Mr. Verhagen was very depressed and had to explain this to his girlfriend Angela, and to his family. Mr. Verhagen had a criminal public defender, who he worked with, but he figured it was all over with.

15. However, in a big break in his criminal case, the public defender went to the gas station to see if there were any surveillance videos. There were, and the public defender

COMPLAINT FOR DAMAGES

Kate Wells and Aaron Lodge, Attorneys for plaintiff

obtained them. Amazingly, **in the footage, it was clearly shown that the police officer had in fact taken the lock and the separate chain, and had put them together himself**, then walked over to Mr. Verhagen and asked something like "well, well, what do we have here....."

16. When the DA viewed the footage, he immediately dropped all charges and arranged forthwith for Mr. Verhagen to be released from incarceration. The DA personally called Mr. Verhagen to apologize. The DA explained that he had been on the phone with the police on the day of the arrest, and that he had believed in good faith that the "weapon" was in fact found on Mr. Verhagen. The DA was sorry for what had happened. Further, Mr. Verhagen's PO officer was extremely upset about what had happened to him.

17. Meanwhile, Mr. Verhagen had been in jail for three full weeks. He had lost his job, which he had slowly gained seniority, and had risen to a decent salary level. He had lost the faith and belief of both friends and family, who thought Mr. Verhagen had broke the law again. He lost his residence, and many of his belongings were in disarray. At the time of this lawsuit, Mr. Verhagen was not able to regain his employment, and has had to work for nearly $15/hour less than his prior job, just to make ends meet, while he puts his life back together.

## FIRST CLAIM FOR DAMAGES
## VIOLATION OF CIVIL RIGHTS (Title 42 U.S.C. Section 1983)
## FOURTH AND FOURTEENTH AMENDMENT
## [ALL DEFENDANTS]

18. Plaintiff re-alleges and incorporates herein by reference the allegations and facts set forth in all prior paragraphs of this complaint.

19. As stated more fully above, the police, acting under color of law, targeted a group of people they "thought" were "bad." The police had absolutely no probable cause to conduct the stops, or to set up a checkpoint surrounding the VFW where the Easter Egg Benefit was to take place. Further, the police manufacture evidence, so they could more fully

-8-
COMPLAINT FOR DAMAGES

search and harass Mr. Verhagen. The police did not do a proper investigation, and continued with their search and arrest. They interfered with the Easter Egg Benefit event, and substantially harmed its success.

20. By doing the actions described above, Defendants have violated the Monterey Bay Confederation of Clubs and Mr. Verhagen's Fourth Amendment protections, as guaranteed by the Fourteenth Amendment.

21. As a direct and proximate result of DEFENDANTS' violation, plaintiff has suffered various damages.

## SECOND CLAIM FOR DAMAGES
## VIOLATION OF CONSTITUTIONAL RIGHT OF FREE ASSOCIATION
## (Due Process Clause of Fourteenth Amendment to United States Constitution -
## 42 U.S.C. §§ 1983 and 1988 -
## [ALL DEFENDANTS]

22. Plaintiff re-alleges and incorporates herein by reference the allegations and facts set forth in all prior paragraphs of this complaint.

23. Defendants harassed both Plaintiffs and the members of the MBOCC who were attempting to attend the Easter Egg Basket Fundraiser. Defendants dampened and inhibited members from arriving and from peacefully attending the event.

24. Defendants had no reasonable cause whatsoever to target plaintiffs and pull them over one by one, for a full inspection.

25. As a direct and proximate result of plaintiff's unlawful actions, plaintiff suffered damages, including loss of income, medical bills, and physical and emotional distress.

26. Furthermore, plaintiff was required to hire legal counsel to protect his constitutional rights and is entitled to payment of his legal fees under Title 42 Section 1988.

27. In doing the acts complained of herein, defendants acted intentionally, or in reckless disregard of plaintiff's rights, with malice and oppression entitled plaintiff an award of punitive damages against the defendants.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION

### [ALL DEFENDANTS]

28. Plaintiff re-alleges and incorporates herein by reference the allegations and facts set forth in all prior paragraphs of this complaint.

29. During the stops referenced above, the officers had no probable cause to target each and every arriving member of the MBOCC.

30. During the arrest of Mr. Verhagen, as stated above, he was charged with a crime based upon the police knowingly and intentionally fabricating evidence.

31. Mr. Verhagen remained in jail for three weeks! The entire time, defendants had multiple manners in which to discover the false pretenses on which he was being held.

32. Defendants violated plaintiff's due process of the US Constitution, as provided by the Fourth and Fourteenth Amendment.

33. As a direct and proximate result of DEFENDANTS' violation, plaintiffs suffered various damages.

## JURY TRIAL DEMAND

34. Plaintiff demands a jury trial.

## PRAYER

**WHEREFORE,** plaintiff prays for judgment against the defendants, and each of them, as follows:

    A. General damages according to proof;

    B. Punitive damages against the individual defendants according to proof;

    C. Attorney's fees pursuant to statute;

    D. Costs of suit; and

COMPLAINT FOR DAMAGES

E. For such other and further relief as the court deems appropriate.

Dated: 3/19/13

_____
KATE WELLS, Attorney for Plaintiff

Dated:

_____
AARON LODGE, Attorney for Plaintiff